# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 348 | **DATE** | November 26, 2002 |
| **CASE TITLE** | United States v. Michael Spano, Sr., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]

The motion of the defendant Emil Schullo for a new trial [336-1] is denied.

The motions of the defendant Michael Spano Sr. for a new trial, in arrest of judgment and for a judgment of acquittal notwithstanding the verdict [341-1] are all denied. ENTER MEMORANDUM OPINION.

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | Ackerman, Allan@17738713304; Cuhrone, James J.@3629907; Durkin, Thomas@9222055; Gillespie, Terrence@9393654; Lipuma, Francis@2634670; Nash, Michael@6290109; Rubinstein, Corey@3380070; Salerno, Alexander@17084843893; Schneider, Matthew@AUSA@8860657; | Document Number |
| | No notices required. | | number of notices |
| X | Notices faxed/mailed by judge's staff. | | NOV 2 7 2002 |
| | Notified counsel by telephone. | | date docketed |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | | 381 |
| | Copy to _____ | | date mailed notice |
| KAM | | | |

01-348.018                                          November 26, 2002

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES | ) | |
| Plaintiff, | ) No. 01 CR 348 |
| v. | ) Hon. John F. Grady |
| MICHAEL SPANO, SR., et al., | ) |
| Defendants. | ) |

DOCKETED
NOV 27 2002

## MEMORANDUM OPINION

Eight defendants stood trial in this case on various charges arising out of an insurance fraud committed against the Town of Cicero as well as related money laundering, bank fraud and tax charges. Seven of the eight defendants were found guilty by the jury on all counts and one defendant, Joseph DeChicio, was found not guilty on all counts. The defendants are awaiting sentencing.

The case received a great deal of media coverage between the return of the indictment and the time of trial, as well as during the trial itself, which lasted three months to the day. Frequently mentioned in the publicity were the defendant Betty Loren-Maltese, President of the Town, and the defendant Michael Spano, Sr., a reputed mob figure. Most of the newspaper articles about the case would refer at one point or another to Spano's "alleged mob ties."

Count 1 of the indictment, charging a RICO conspiracy to defraud the Town, recited that the defendant Michael Spano, Sr. and Frank Maltese (the deceased husband of the defendant Betty Loren-Maltese) were associated with "organized crime in the Chicago area and used their organized crime relationship to influence the operations of the Cicero Town government." (Count 1, ¶1 (q)). After briefing by the parties, including a proffer of evidence by the government, the court determined that this "organized crime" allegation was unrelated to the charges in the indictment and would unfairly prejudice the defendants. Accordingly, the court struck this allegation from the indictment. Throughout the trial, the court consistently sustained defense objections to any evidence which seemed to suggest an organized crime connection to the case, and the jury was repeatedly admonished not to read, watch or listen to anything in the media about the case. At appropriate times we inquired of the jurors whether they had seen or read particular items in the media, and the response was always negative or otherwise satisfactory. In their post-trial motions, none of the defendants contends that the court failed to take any necessary precautions or that during the trial anything came to our attention that was not dealt with appropriately.

The subject of this opinion is something that happened after the jury was discharged on the final day of the trial. Several of the jurors were interviewed by the press, and articles concerning

the interviews were printed in the <u>Chicago Tribune</u> for the two days following the trial, August 27 and August 28, 2002. In the August 27 article, the following information was attributed to one of the jurors:

> The elder Spano's reputed mob connections also came up in the jury room, the juror said, even though U.S. District Senior Judge John Grady had forbidden its mention in court as too prejudicial to the defendants.
>
> That too upset the juror.
>
> "They weren't supposed to bring that up. We're only supposed to use the evidence," he said.

(Exhibit A to Government's Consolidated Response to Defendants' Post-Trial motions.) This item in the newspaper prompted a motion by the defendant Schullo, filed the same day, requesting the court to conduct an evidentiary hearing of the jurors relating to "prejudicial extraneous influences during the jury's deliberations and potential jury misconduct," or, alternatively, "to permit counsel to contact and interview the jurors." (All of the defendants are deemed to have joined in the motion, and the defendant Spano, Sr. filed his own separate, similar motion.) The court denied the motion, stating that the newspaper article was an insufficient basis for the inquiry requested. The denial of the motion is one of the grounds asserted by Schullo, and all other defendants, for a new trial.

At a later point in this opinion, we will discuss the August 27 <u>Tribune</u> article. Before turning to that, it will be useful to

frame the issue to be addressed in this opinion and to give some information about the jury that will be relevant background.

The primary legal authority applicable to this aspect of the defendants' motion for a new trial is Federal Rule of Evidence 606(b), which provides that upon an inquiry into the validity of a verdict,

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith, <u>except that</u> a juror may testify on the question whether <u>extraneous prejudicial information</u> was improperly brought to the jury's attention or whether any <u>outside influence</u> was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement made by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b)(emphasis added.) Rule 606(b) "is designed not only to protect the jurors from being pestered by lawyers after verdicts are rendered, but also to protect the judicial process from efforts to undermine verdicts by scrutinizing the jurors' thoughts and deliberations. Thus, a court will not inquire into the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and votes, in the absence of a claim of external influence." <u>United States v. Ford</u>, 840 F.2d 460, 465 (7th Cir. 1988) (citations omitted).

The Rule "also prevents individual jurors from manipulating the system by later repudiating the verdict when their views were

in the minority." United States v. Allen, 736 F. Supp. 914, 918 (N.D. Ill. 1990) (citing In re Beverly Hills Fire Litigation, 695 F.2d 207, 213 (6th Cir. 1982)).

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982).

"A defendant is only entitled to a new trial if there is a reasonable possibility that the evidence had a prejudicial effect upon the jury's verdict." United States v. Berry, 92 F.3d 597, 600 (7th Cir. 1996).

In determining whether there is a "reasonable possibility" that some extraneous matter "had a prejudicial effect upon the jury's verdict," Berry, 92 F.3d 600, there are a number of relevant factors for the court to consider. "Determining whether a verdict was affected is a fact-driven exercise that will depend upon the circumstances of the case." United States v. Sanders, 962 F.2d 660, 668 (7th Cir. 1992). An important factor is the judge's assessment of the jury itself, based on the jurors' behavior during the trial. Sanders, 962 F.2d at 673-74; United States v. Bruscino, 687 F.2d 938, 941 (7th Cir. 1982). See also United States v. Genova, 187 F. Supp.2d 1015, 1025 (N.D. Ill. 2002):

> Among the considerations taken into account by this Court in determining whether there is a "reasonable possibility" that the extraneous dictionary definition of bribe prejudiced Genova and Stack are: (1) our observation of the jurors' attentiveness during the trial; (2) whether they took notes; (3) whether they

appeared to listen closely to the evidence; and (4) whether they demonstrated careful consideration in reaching their verdicts by, for example, taking the time during their deliberations and considering the evidence as to each count and each defendant. See, e.g., United States v. Allen, 736 F.Supp. 914, 922 (N.D. Ill. 1990).

The jury in this case can only be described as exemplary. During the three-month trial there was not a single instance of absenteeism and only a few instances of tardiness, always explained by some event beyond the control of the juror, such as an interruption in train service. The jurors were consistently attentive and appeared to follow the testimony closely. Most of them took extensive notes. There was one juror who, for a brief period of time, had some difficulty staying awake. This was brought to our attention by the juror sitting next to her (who was later elected foreperson), who said that his drowsy colleague was creating a bad public impression and asked the court to do something about it. We complied with the request and admonished the drowsy juror privately. She informed us that the reason for her difficulty was that, in addition to her jury service each day, she was holding down a full-time job. After our admonition the problem ceased.

This was not the only time the jury indicated the seriousness with which they regarded their task. Early in the trial, several jurors complained to us that a person they encountered in the building cafeteria at lunchtime had made what they regarded as an inappropriate attempt to communicate with them. The jurors

involved were extremely upset about the matter because the person in question was sitting in the courtroom as a spectator. We interviewed the person at sidebar and asked her to leave the courtroom when we concluded that her continued presence would be of concern to the jurors.

A more troublesome incident was brought to our attention by a juror who sent a note asking whether it was permissible for a juror to bring materials into the jury room and do independent research.[1] Upon inquiry, we learned that a juror had brought in a book about Cicero (which contained a section about Al Capone) as well as some maps. Although he denied it, he was reported by other jurors to have made some derogatory comments about some of the defendants. We interviewed each member of the jury *in camera* as to any effect this extraneous material and any comments of the juror had on their consideration of the case, and were assured that they had none. We discharged the offending juror but concluded that the defendants had not been prejudiced by the misconduct.

This was not a jury that was likely to have been affected by references to prejudicial matters they knew they were not to consider in arriving at their verdict. On the contrary, they gave ample evidence of their dedication to the task of deciding the case on the basis of the evidence produced in court and nothing else.

---

[1] "Is it proper for a juror to bring in maps and do personal research on his own[?]." Note from juror, filed July 26, 2002.

With this preliminary evaluation in mind, we turn to the other factors that are appropriate for consideration in determining whether there is a reasonable possibility that extraneous material had a prejudicial effect on the verdict.

### The Nature of the Extraneous Information

We will assume for purposes of this discussion that the Tribune article of August 27, 2002, contained a correct quotation of what the juror said: "The elder Spano's reputed mob connections also came up in the jury room ...." A number of things are immediately apparent. There is no indication of what was meant by "came up." The juror is not quoted as saying when the matter came during the three-month trial, or in what connection. He does not say that it came up during deliberations, nor, of course, does he say that it affected the deliberations, or the opinion of any juror as to guilt or innocence, or the ultimate verdict. It was simply a matter that "came up" at some indefinite time in some unspecified way.

Schullo argues that the next portion of the newspaper report, "...even though U.S. District Senior Judge John Grady had forbidden its mention in court as too prejudicial to the defendants," and, again quoting the juror, "[t]hey weren't supposed to bring that up. We're only supposed to use the evidence, he said," indicates that the juror must have learned from some extraneous source that the court had forbidden the mention of mob connections and that the

jury was "only supposed to use the evidence." We do not read the article this way. The "even though" portion seems to be not a statement by the juror but a statement by the reporter, based on the reporter's knowledge of the court's pretrial ruling. The juror's comment about only being permitted to use the evidence was simply a paraphrase of what the court had told the jury repeatedly during the trial and again in the final instructions given at the end of the case.[2] So, as far as any extraneous information is concerned, we are left with the juror's statement that "[t]he elder Spano's reputed mob connections also came up in the jury room ...."

### Whether the Extraneous Matter was Prejudicial, and, if So, to Whom

Having a "mob connection" is obviously something that would be regarded unfavorably by most people, including jurors. This is one of the reasons we struck the "organized crime" allegation from the indictment and ruled that no evidence of organized crime would be admitted at trial. But the basis for our ruling was not simply that the matter would be prejudicial; if it were relevant, its prejudicial impact would not, standing alone, be a basis for keeping it out. The ultimate reason we kept it out is that, after making an exhaustive analysis of the government's proffer of its "organized crime" evidence, we determined that it was irrelevant to

---

[2] The jury instructions are another important factor that we will discuss infra at 12-13.

the charges in the indictment.[3] Therefore, there was no possibility that any prejudicial impact of the proffered "organized crime" evidence would be outweighed by its probative value. It had no probative value.

This irrelevance of Spano Sr.'s purported "mob" connection to the charges in the indictment bears heavily on whether any extraneous information about that connection might have had a prejudicial effect upon the jury's verdict. To conclude that such an effect was likely, one would have to assume that the jury would take an extraneous item that was irrelevant to the charges and use it as a basis for a finding of guilt. In other words, defendants' theory has to be that hearing about Spano's mob connection would so inflame the jury that it would cause them to ignore an insufficiency of evidence and find Spano guilty, and, in addition, find all of the other defendants guilty as well — and on all counts. Everything we know about the attitude and behavior of this jury makes the theory implausible in the extreme.

The question might be somewhat different if a "mob connection" would have been in any way probative of the charged offenses. But a mob connection of Spano Sr. would have no bearing whatever on whether the defendants defrauded the Town by submitting false invoices for fictitious insurance services. An ordinary dishonest claims agent could have defrauded the Town in the same way Spano

---

[3] See Memorandum Opinion of January 8, 2002.

did. Similarly, a "mob connection" would not have facilitated the fraud against the bank, the money laundering or the conspiracy to defraud the Internal Revenue Service. Those kinds of offenses are committed by persons in all walks of life, with varying backgrounds, and have no necessary or even logical association with organized crime. Neither the charges nor the evidence surrounding any of them smacked of "the mob" or of any underworld influence.

If information about Spano Sr.'s reputed mob connection was irrelevant to the charges against him, it was even more irrelevant to the guilt of the six other defendants who were convicted. If it was highly unlikely that the jury would have found Spano Sr. guilty on the basis of irrelevant information that he had a mob connection, there is even less basis for speculating that the jury would have found any of the other defendants guilty because they learned of Spano Sr.'s reputed mob connection.

A case that is instructive on this relevance question is United States v. Bruscino, 687 F.2d 938 (7th Cir. 1982). The defendants were charged with committing murder in a federal prison. During the trial, "[t]wo documents not in evidence found their way into the jury room." Id. at 939. One of the documents was a letter by the Bureau of Prisons to the defendant Bruscino which mentioned "institution investigations regarding your suspected involvement with the Mexican mafia," and also stated that "investigations by this office have not disclosed evidence of any

significant nature, that would indicate your involvement in any unauthorized group." Id. The Court of Appeals affirmed the convictions and held that the district court had not abused its discretion in denying a new trial:

> [W]e cannot say that the district judge abused his discretion in concluding that the report <u>was highly unlikely to have prejudiced the jury</u> against Bruscino and Kell. Nothing in the testimony at trial connected Bruscino to any Mexican Mafia; a pretrial stipulation, not alleged to have been violated, forbade mention at trial of any relationship between Bruscino and the Mexican Mafia. We cannot agree with the appellants that the connection insinuated by the report supplied a motive for the murder, for there was no indication either in the report or in the evidence at trial of what the Mexican Mafia is or does or how the other conspirators or Martinez, the victim, might have been connected with it. . . ."

Id. at 940 (emphasis added). Like the "Mexican mafia" connection in Bruscino, the reputed "mob connection" of Spano Sr. "was highly unlikely to have prejudiced the jury" in this case because it had no tendency to prove that Spano Sr. or any other defendant was guilty of any of the charges in this indictment.

### Jury Instructions

Another thing the court may consider in determining the possibility of a prejudicial effect on the verdict is "the power of curative instructions." Sanders, 962 F.2d at 668. In holding that the trial court in Sanders had not abused its discretion by refusing to question the jurors about whether they had learned of a mid-trial threat against one of their fellow jurors, the Court of Appeals noted that the judge had "pointed out that the jury had

been repeatedly admonished to make its decision based on the evidence, and had been warned to disregard press reports and all other outside sources of information about the trial." Id. at 672-73. In the instant case, the jury was repeatedly admonished at the close of trial sessions not to read, watch or listen to anything in the media about the case. In the instructions given at the conclusion of the case, the jury was told that "the evidence which you should consider consists only of the testimony of the witnesses and the exhibits which the court has received, as well as any stipulations between the parties." (Court's Instruction No. 1.) They were also instructed that "anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio or television reports that you may have seen or heard." (Court's Instruction No. 6.)

There is a presumption that jurors follow the court's instructions. United States v. Lahey, 55 F.3d 1289, 1299 (7th Cir. 1995) (jurors are presumed to follow court's instruction to consider only the evidence received in the case); United States v. Cousins, 842 F.2d 1245, 1248 (11th Cir. 1988) (jurors are presumed to follow court's instruction not to read, watch, or listen to any news accounts pertaining to the case).

We can see no reason to think this jury ignored the instructions concerning extraneous information.

## The Limited Nature of the Permitted Inquiry

The reference in the <u>Tribune</u> article of August 27 to "Spano's reputed mob connections" would have given us little to work with even if we had thought an inquiry of the jurors was appropriate. As explained in <u>Sanders</u>, 962 F.2d at 673, it would not have been permissible to ask the jurors "what role the communication played in their thoughts or discussion." Rather, we would have been limited to asking the jurors what the communication was — i.e., finding out what they had learned about Spano's reputed mob connection — and then determining, solely from that information, "whether there is a reasonable possibility that the communication altered their verdict." <u>Id.</u>

This case is distinguishable from cases where the extraneous information had a direct bearing on the charges in the indictment and the court could determine on the face of the information that it could well have affected the verdict. <u>See, e.g.</u>, <u>Berry</u>, 92 F.3d 597 (jurors exposed to an unauthenticated transcript identifying defendant as a speaker in a conversation about one of the drug transactions alleged in the indictment). Here, because Spano's alleged mob connection is so unrelated to the charges, we would simply have to speculate that information about it might have affected the verdict. Speculation could not establish a "reasonable possibility" that the information had a prejudicial effect upon the verdict.

It might be argued that the paucity of information in the <u>Tribune</u> article made it imperative that we conduct interviews of the jurors to find out the details as to how Spano's mob connection "came up in the jury room," and how, if at all, it affected the verdict. But as we have indicated, <u>Sanders</u> forecloses any such argument. The trial judge in that case had very little information to indicate, one way or the other, whether the other jurors had learned of the threat to their colleague. What the judge knew was that the threatened juror had arrived late to court and that the threat to her had received media coverage. At the end of the session that day, the jurors asked for "protection on their way out of the courthouse." 962 F.2d at 670. In arguing on appeal that the trial judge had erred in refusing to interview the jurors, the defendants contended that "the late arrival of Juror Layton and the jury's request for protection indicated that the entire jury had <u>somehow</u> learned of the threat, either though media reports or from Juror Layton herself." <u>Id.</u> (emphasis added).

The Court of Appeals held that the trial judge did not err in refusing to question the jurors, pointing out that the limited questioning permitted by Evidence Rule 606(b) would have provided very little additional information:

> We believe that the court did not err in finding, without questioning the jurors, that there was no reasonable possibility that the verdict was influenced. We note first that any post-trial inquiry would have been severely restricted by Federal Rule of Evidence 606(b). As we have recently held:

> Rule 606(b) of the evidence rules, far from giving a judge carte blanche in questioning a jury about its verdict, forbids him to inquire into the jurors' beliefs, opinions, discussions, grounds, etc., save as necessary to determine the existence and content of any unauthorized communication made to the jury. The proper procedure therefore is for the judge to limit the questions asked the jurors to whether the communication was made and what it contained, and then, having determined that the communication took place and what exactly it said, to determine--without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion--whether there is a reasonable possibility that the communication altered their verdict.
>
> Haugh v. Jones & Laughlin Steel Corp., 949 F.2d 914, 917 (7th Cir. 1991). While Rule 606(b) would have allowed the jurors to testify whether they had learned of the threat, it would have prevented a juror from testifying "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror." Fed. R. Evid. 606(b); see also Wiedemann v. Galiano, 722 F.2d 335, 337 (7th Cir. 1983) (Rule 606(b) "prohibits jurors from giving post-verdict testimony as to whether their deliberations, in fact, were prejudiced by . . . extraneous information or outside influence."). Rule 606(b) would almost certainly have insured that questioning the jurors would not have revealed much more than what the court assumed: that the jurors knew of the threat during their deliberations.

Sanders, 962 F.2d at 673 (footnotes omitted).

We believe now, as we did at the time we denied defendants' motion to conduct post-trial juror interviews, that there was no sufficient reason to conduct the interviews.

## The Length of the Jury Deliberations
## and the Acquittal of the Defendant DiChicio

The argument that the defendants may have been convicted because the jury learned of Spano Sr.'s alleged mob connection supposes a deliberative process that ignored the requirement of proof beyond a reasonable doubt, ignored the court's instructions of law, and went outside the evidence to reach an irrational conclusion. We have mentioned several things indicative of the jury's trustworthiness. Two additional indications are important to consider.

The jury deliberated for 11 full days before reaching their verdict. While we cannot know the content of their discussions,[4] it does seem improbable that a jury would deliberate for 11 days and then base its verdict on one irrelevant and extraneous piece of information. It seems more likely that the lengthy deliberation reflects a painstaking analysis of the voluminous evidence as applied to each of the eight defendants on each of the counts.

Finally, there is a very important factor which the defendants completely ignore in their post-trial motions: the jury found the defendant Joseph DiChicio not guilty on all counts. DiChicio was the Cicero Town Treasurer who signed most of the authorizations for the $12 million the Town sent to Spano Sr. and his co-conspirators

---

[4] The Tribune article of August 28, if it were considered along with the article of August 27 that the defendants rely on, would indicate that the deliberations were thorough, fair and systematic. (Exhibit A to Government's Consolidated Response to Defendants' Post Trial Motion.)

in payment of their fraudulent invoices. The government's theory was that DiChicio knew the invoices were fraudulent, or that he deliberately ignored the telltale signs that they were fraudulent. (We gave the "ostrich" instruction, which was particularly relevant to the case against DiChicio.) (Government's Instruction No. 20.) The verdict on DiChicio could have gone either way. Yet, the jury found him not guilty on all counts, obviously distinguishing the evidence against him from the evidence against the other defendants. Had Spano Sr.'s "mob connection" been taken into consideration by the jury, and regarded by them as a sufficient basis for finding all defendants guilty, they would have found DiChicio guilty. DiChicio's acquittal is a powerful indication that the jury separately considered the evidence against each defendant and based their verdict on the evidence and nothing else. See United States v. Smith, 26 F.3d 739, 760 (7th Cir. 1994) (one of the factors the court may consider in determining whether there was a reasonable possibility of prejudice from extraneous information is "the mixed nature of the verdicts.")

## Conclusion

We conclude that there is no reasonable possibility that extraneous information concerning the defendant Spano Sr.'s alleged "mob connection" had a prejudicial effect upon the jury's verdict.

Date:     November 26, 2002

ENTER:    _____
          John F. Grady, United States District Judge